STATE OF MINNESOTA v. DULUTH & I. R. R. CO. et al. DULUTH & I.
R. R. CO. et al. v. STATE OF MINNESOTA et al. COBB v.
DULUTH & I. R. R. CO. et al.

(Circuit Court, D. Minnesota, Third Division. November 22, 1899.)

1. PUBLIC LANDS—RAILROAD GRANT OF SWAMP LANDS BY STATE.

The Minnesota act of March 9, 1875, granting swamp lands of the state in aid of the construction by the Duluth & Iron Range Railroad Company of a road from Duluth to a designated point on the Mesaba iron range by the "shortest and most feasible route," provided for the making of a survey, and the filing of a map with the secretary of state, on which all swamp lands within 10 miles on each side of the line as shown should be withdrawn and reserved from sale; that on the construction of each section of the road the governor should cause it to be examined by commissioners, and on their certificate of its completion in a good and substantial manner, as contemplated by the act, to notify the secretary of state, who should issue swamp-land certificates for the lands earned. *Held,* that under such provisions the executive department of the state was vested with authority to determine not only as to the proper construction of the road, but also as to whether the route selected was in compliance with the act; and that, in the absence of fraud, its determination of such questions in favor of the company, and the conveyance to it of a portion of the lands in accordance with the provisions of the act, were conclusive upon the state, not only as to the lands so conveyed, but as to all others earned, and to which the company was entitled, under the terms of the grant.

2. SAME—POWER OF LEGISLATURE TO AMEND—CHANGE OF TERMINUS.

The purpose of the grant being to secure the construction of a railroad into the mining region, and the northern terminus, as fixed by the act, being short of such region as it subsequently developed, it was within the province or power of the legislature, as it did by the amendatory act of 1883, to change such terminus.

3. SAME—FORFEITURE OF GRANT—CONSTITUTIONAL AMENDMENT.

The amendment to the constitution of Minnesota, adopted in 1881, providing generally the manner in which "all swamp lands now held by the state" should be disposed of, did not operate as a forfeiture or resumption of the grant of swamp lands that had previously been made by the legislature to the Duluth & Iron Range Railroad Company, although the company was then in default, under the conditions of the grant, in view of the rule that a declaration of forfeiture must be clear, unambiguous, and unmistakable.

4. RAILROAD MORTGAGE—VALIDITY.

A mortgage given by a railroad company to a trustee is not void under the Minnesota statute of uses and trusts.

5. PUBLIC LANDS—GRANT BY STATE TO RAILROADS—POWER TO FORFEIT GRANT.

The Minnesota act of April 21, 1897, purporting to declare a forfeiture of lands previously granted to the Duluth & Iron Range Railroad Company, is invalid, as impairing the obligation of the contract made by the grant, the railroad having been fully completed, and the lands earned, prior to its passage.

Henry W. Childs and W. P. Warner, for the state of Minnesota.

Frank B. Kellogg, for Walter F. Cobb.

J. H. Chandler, for Duluth & I. R. R. Co.

M. D. Grover, for Minneapolis & St. C. and Great Northern R. Cos.

LOCHREN, District Judge (orally). The question in the case is whether the lands granted by the state of Minnesota to the Duluth

97 F.—23

& Iron Range Railroad Company by the act of March 9, 1875, as amended, on condition that the company should build the railroad described and contemplated, have ever become vested in the railroad company by the performance of the condition, or whether the railroad company failed to perform such condition, and the state, by a declaration of the forfeiture of the grant while there was such a failure, has devested or ended the grant, and resumed the title to the lands. I think all these cases depend upon the solution of that question. The act of March 9, 1875, enacts substantially as follows:

"That for the purpose of aiding the Duluth & Iron Range Railroad Company, to construct a railroad from Duluth by the shortest and most feasible route, to the northeast corner of township 60, range 12, west, on the Mesaba iron range, there is hereby granted to said corporation or its assigns, an amount of swamp lands belonging or hereafter to accrue to the state under the act of congress of March 12th, 1860, equal to ten sections per mile for each mile of road that may be completed and can be selected within ten miles on each side of the road."

Then it provides that, should there not be a sufficient amount of said lands unsold and unappropriated within the 10-mile limit, the grant may be located on swamp lands that had accrued to the state, not otherwise disposed of, within the counties of St. Louis, Lake, and Cook, and no other counties in the state. It also provided that the gauge of the road should not be less than three feet, laid with iron or steel rails not less than 25 pounds to the yard, and that no land should accrue to the company until previous land grants of the state should become satisfied or forfeited. Then it provided that the governor of the state should be notified by the company of the completion of each 10 miles of road, and then it should be "his duty to have the same examined by sworn commissioners, and on their certificate of the completion of each consecutive ten miles in a good and substantial manner, as contemplated by this act, he shall notify the secretary of state, who shall forthwith cause swamp-land certificates to be issued to the president and directors of the company for the number of acres they shall be entitled to under this act." It further provided that within 12 months from the passage of the act the company should cause a survey of the road to be made, and file a map with the secretary of state; that at least 20 miles of the road should be built within two years, and the whole completed within five years. There was also a provision exempting the land from taxes for a certain time. Section 3 provided that, after the filing of the map showing the line of the road, as provided in the last preceding section, the swamp lands belonging to the state for 10 miles on each side of the line of the road should be withdrawn from sale for the purposes contemplated in the act.

It is admitted by counsel in the arguments, and is a matter of undisputed history, that previous to the passage of this act iron ore had been discovered to some extent on what is known as the "Mesaba Range" and in other parts of that country lying to the north or northeast of Duluth, and it was deemed a matter of interest to the people of the state that these iron mines should be developed in some manner. Duluth was the nearest point to these mines at which there were any railroads, or any improved harbor in connec-

tion with lake navigation; and it was deemed essential to the development of these mines that there should be railroad connection between these points and Duluth, so that persons and supplies could be taken to, the mines, and their product, wherever it came from, brought out on this railroad, and connected with the commerce and transportation of the world. Undoubtedly it was the expectation that there would be an advantage to the city of Duluth itself, by its railroad connection, in supplying these mines and the industries that might be connected with them, and perhaps in handling the products that would come therefrom. Where these industries should be located was not specified in the act. There was no provision that there should be smelting works, docks, or anything of that kind erected in the city of Duluth; but there was a provision that there should be railroad connection with the mines; and the advantages incidental thereto, whatever they might happen to be, in the development of the enterprises, might naturally be expected to come to Duluth. It is evident, when we look at this act, that the discoveries of such an immense extent of iron ore in that region as have since been made were not contemplated by the legislature at the time of the passage of the act; otherwise, it would scarcely have provided for a railroad of not less than three-foot gauge, and a weight of rails of not less than 25 pounds to the yard. When we consider what has been developed in that region, the kind of railroad that has been built in connection therewith,—a commercial railroad, with rails 80 to 100 pounds to the yard, with immense locomotives running upon them,—and also consider the other railroads that have been extended into that same region in the development of these mines, it is evident that the extent of these mines was not contemplated by the legislature at the time the act was passed. It does not appear whether the legislature contemplated that the crude product as it came from the mines should be brought to Duluth, and there transshipped to other places throughout the country, whether smelting works might be established there, or near the mines, where they could bring coal and coke and other supplies for the carrying on of that business, or whether rolling mills might be established near the mines, or at some convenient and suitable point intermediate, or what the particular advantages to Duluth might be. There has been testimony in the case, referred to by counsel at considerable length, showing that the docks which were erected by the Duluth & Iron Range Railroad Company at Two Harbors might have been placed in Duluth harbor. It appears that before this railroad was built, or, at any rate, prior to the amendment of this act, the St. Paul & Duluth Railroad Company, the Omaha Railroad Company, and perhaps other railroad companies, had established their lines along the front of the wharves or docks in the city of Duluth, and occupied considerable territory back of those docks. It is evident it would be important for commercial railroads, in connection with material which might be brought to Duluth for shipment elsewhere, to be taken and transported by water transportation, or the reverse, where they receive shipments of material brought from other places by water to Duluth, to have docks con-

venient for these purposes upon or adjoining their own grounds, and that these terminal facilities along the docks were of great importance to these railroad companies. It is urged in the argument that the Duluth & Iron Range Railroad might have crossed the lines of these railroad companies which had already occupied these docks, even against the desires of these companies. But I think it may be fairly presumed that these companies would have opposed the occupation of these docks or this dock frontage by the Duluth & Iron Range Railroad Company; and it is evident that such occupation of this frontage by ore docks would have very much impeded the use, and very much lessened the value, of the terminals of the railroad companies along those docks. If the question were an open one, or if it were conceded that the Iron Range Company had the right in law, by paying compensation such as would be assessed, to make this crossing (not for the purpose of extending the road any distance further, but for the very purpose of taking possession of what was virtually the terminals of these other railroads), I do not think it would be a public advantage to the city of Duluth. That is the way it strikes me. The dockage front in Duluth between Minnesota Point and Rice's Point, as shown on the map, and as every one knows who has examined it, is limited, and not more than is necessary for the present and the reasonable future prospective necessities of the city in carrying on its ordinary commercial business. The transfer of passengers back and forth from the boats to the cars, and the transfer of ordinary merchandise in which all the merchants and business men of Duluth are interested, which constitute the business that has built up the city, require this frontage; and it appears that this frontage is not more than sufficient to accommodate that class of business. Now, suppose the Duluth & Iron Range Railroad Company should cover that dockage front, or a large portion of it, such as would be necessary for its ore docks, which the testimony shows are large,—some 50 feet or thereabouts in height,—and between the docks there would have to be slips on each side (I do not know that their width is shown by the testimony), if that would be a benefit to the city, then it would be a benefit to it that all the roads coming from that iron region should locate their iron-ore docks at that place; and if, in addition to the Duluth & Iron Range ore docks, the docks of the Duluth, Mesaba & Northern Railroad were brought in there, and those of the Great Northern Railway Company, all of which now go into Two Harbors, St. Louis and Allouez Bays,—if those docks are all put into the space between Rice's Point and Minnesota Point,—they would fill the whole of it, and shut off and destroy the harbor of Duluth for all commercial purposes. This transshipment of ore is a business in which the people of Duluth could have no special connection or interest. Only the owners of the mines and the purchasers of the ore for large smelting works East would have any connection with it. It would afford very little employment, because the ore is carried up on high tracks, and dumped by the force of gravitation into pockets in the docks, and by the same force into the holds of vessels, giving very little employment to persons in the city. I do not

believe that the people of the city of Duluth would submit quietly to the occupation of the entire dock frontage there by ore docks. Such occupation would not be an advantage to the city of Duluth, but, it seems to me, would be the greatest detriment.

Now, should smelting works, or rolling mills, or other works for the manufacture of iron be established in the city of Duluth, a railroad is built, and ore in any needed quantity for works of that kind can be brought there by this railroad. It appears that Two Harbors was a convenient point at which to establish the docks of this Duluth & Iron Range Railroad, and to receive the ore merely for the purpose of transshipping it to points on the Lakes; and it was a place where such transshipment did not disturb injuriously the business of Duluth. So far as Duluth is concerned, I think it was as advantageous as if the road had been carried through to St. Louis Bay, or where the other ore docks are at Allouez Bay. If we suppose that at the time this road was built smelting works, rolling mills, or anything of that kind had been established or in contemplation at Two Harbors, I do not think there would have been any question that, in the exercise of good judgment, it would have been regarded as the duty of the railroad company to make that place one of the points upon their route between Duluth and the mines. It seems to me that would be a good place for the establishment of works of that kind, because it is not far from the mines, and is a point where the product of the works or mills could be shipped to the markets where needed, and a point where coal, coke, and other necessary supplies for works of that kind could be readily received from where they are produced at Eastern ports of the Lakes.

But I think this is not the question for the court to determine in this case. This act did not contemplate that there should be a lawsuit in order to determine whether its terms were complied with. The act contained in itself the provisions for carrying it out, and it referred these matters to the executive department of the government, to be administered by them. It provided that the route should be the shortest and most feasible. That does not mean an air line,—a direct line,—but a route which should be determined not only by being short, but also by reference to other considerations, both such as would affect the building of the road by a route on which it could be profitable and fairly cheaply built, and also a route that had reference to the advantages to the road itself when built, and to the advantages which the road would afford to the business which would naturally result from or be connected with it. The act itself provides, in the first place, that a survey of the road shall be made, and a map of the route filed with the secretary of state within one year. The filing of such map would be a notification to the executive department having charge of the administration of this act as to the route selected; and I think the governor and the secretary of state had the same right to determine whether the route so selected conformed to the provisions of the act as the interior department has in relation to routes designated in land grants made by the United States. They would have a right to determine as to whether the route selected and shown upon the map

thus filed was a compliance with the act. The executive department is the department to which the act intrusted this matter, and therefore, unless its action can be attacked for fraud, or unless it can be shown that the governor and secretary of state were imposed upon by fraud, or something of that kind, their decision is final in this matter that was intrusted to them. The act provides that upon the filing of the map showing the line of road certain acts shall be done by the executive department; that is, the lands along the line for 10 miles on each side of the road were to be withdrawn from sale for the purposes contemplated in the act. The northern terminus of this road was changed by the act of 1883. It does not seem to me, if the question were an open one, that such change was beyond the power of the legislature. The object of the act was to reach this mining region. It is admitted in the argument that the point named in the original act was one which would not reach this region; therefore the legislature properly agreed to the change as to the northern terminus by the act of 1883. The grant, up to that time, was a float, until there was a location of the line. There was no particular or special description of lands granted; and it was within the power of the legislature, taking into consideration the purposes for which the act had been passed, to change the route sufficiently to accomplish the original purpose. It seems to me that this matter has necessarily been passed upon by the supreme court of the state of Minnesota in the case of Minneapolis & St. C. R. Co. v. Duluth & W. R. Co., 45 Minn. 104, 47 N. W. 464, cited by counsel.

It is urged further that the constitutional amendment of 1881 having been adopted at a time when the road was in default, amounted to a declaration of forfeiture; that thereupon the land was resumed by the state; and that the legislature of 1883 could not make a new grant. This would be true if the constitutional provision had that effect. I think it has not. The holdings of all courts in relation to legislative declarations of forfeiture are that they must be clear, unambiguous, and unmistakable. There is not a word in the constitutional amendment of 1881 which indicates a purpose on the part of the state to forfeit any grant. It provides that "all swamp lands now held by the state or that may hereafter accrue to the state, shall be appraised and sold in the same manner and by the same officers, and the minimum price shall be the same, less one-third as provided by law, for the appraisement and sale of school lands." It does not declare that lands which the state has granted, as to which, under the conditions of the grant, there has been a default, should be resumed. Nothing of the kind. There were swamp lands at the time in a condition where the purposes to which they should be applied might be properly provided for by a constitutional amendment or by a legislative act. It is not necessary to give such construction to the act, and the language does not, by any fair interpretation, bear that construction. I think it may be fairly said that this matter is passed upon in the case to which I have already referred in 45 Minn. and 47 N. W. In that case the title claimed by the defendant the Duluth & Winnipeg Railroad

was dependent entirely and wholly upon the assumption that the Duluth & Iron Range Railroad Company had forfeited its grant, and that was one of the questions before the supreme court. It appears that this constitutional amendment was called to the attention of the court in that case, because the court referred to it in connection with another matter. It is true the court does not suggest or consider it with reference to forfeiture, but it seems to me the only inference from that is that it was so plain that the act did not refer to anything of the kind that neither the court or the attorneys considered it had that effect, for the court held that, in order to be effectual as the legislative forfeiture of the grant, the language of an act must be clear, unambiguous, and unequivocal. Now, it appears after the road was built, no land having been certified to the company (as the act of 1883 provided that should not be done until after the road was built), sworn commissioners, provided for in the act of 1875, were appointed, and went over the road, and made a report that the road had been built in accordance with the act; and there is no question that, so far as the construction of the road is concerned, it did come up to the requirements of that act. Upon that lands have been conveyed to the railroad company as earned by it under this grant, and it seems to me upon the whole case it is clear that the railroad company was entitled to those lands.

As far as the case of complainant Cobb is concerned, it appears a mortgage was made before the passage of the act of April 21, 1897, and that he was named as trustee in such mortgage. I do not think that this mortgage was void under our statute as to uses and trusts. That has come down to us from a New York statute upon the same subject, and the same statute has been adopted in the states of Michigan, Wisconsin, and several Western states. In all of those states there have been from that day to this railroad mortgages more or less like this one under consideration, and the authority to make them has never been questioned. I do not think I am required to examine as to the validity of a trust of this nature, inasmuch as there have been similar trusts ever since the adoption of this statute of uses and trusts in New York and other states, which have not been questioned under that statute. It appears that Mr. Cobb is a resident of the state of Illinois, and, it being admitted that the amount involved is sufficient to give jurisdiction to this court, I think, as far as that case is concerned, this court has jurisdiction, and that the complainant Cobb is entitled to the relief asked, and that the temporary injunction granted against the state officers be made permanent. I think the state of Minnesota is not entitled to the lands that have been deeded to the Duluth & Iron Range Railroad Company, and that the state is under obligation to convey to that railroad company lands which have not yet been selected or conveyed; and, further, that in the state case the state is not entitled to the relief demanded.

I may say further that it follows from what I have already said that the act of April 21, 1897, is invalid, as impairing the obligation of previous contracts. That act purports to declare a forfeiture of these lands, but, as the condition had been entirely fulfilled, the rail-

road completed, and the lands earned, it was not within the power of the state, as held by Judge Mitchell in the case cited, to resume the lands. Decrees will be entered accordingly.